UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA *ex rel.*
DEBORAH CONRAD,

               Plaintiff/Relator,

      v.                                      23-CV-438 (JLS)

ROCHESTER REGIONAL HEALTH and
UNITED MEMORIAL MEDICAL
CENTER,

               Defendants.

## DECISION AND ORDER

Relator Deborah Conrad brought this False Claims Act ("FCA") case against

Rochester Regional Health and United Memorial Medical Center (collectively,

"RRH"). Dkt. 1, 34. RRH moved to dismiss Relator's amended complaint. *See* Dkt.

37–38. For the reasons set forth below, the motion to dismiss is granted in part and

denied in part.

## PROCEDURAL HISTORY

Relator Conrad filed the original complaint under seal on May 17, 2023. Dkt.

1. The United States declined to intervene, Dkt. 7, and the Court unsealed the case.

Dkt. 8.

RRH filed a motion to dismiss on May 28, 2024. Dkt. 21. Relator responded

(Dkt. 27), and RRH replied. Dkt. 28. The parties appeared for oral argument on

August 20, 2024, and this Court granted the motion to dismiss with leave to amend. *See* Dkt. 29–30.

Relator then filed an amended complaint that RRH again moved to dismiss. Dkt. 34, 37–38. Relator responded (Dkt. 45), and RRH replied. Dkt. 46. The Court held oral argument on March 11, 2025. *See* Dkt. 47.

## AMENDED COMPLAINT

Relator alleges that RRH violated the FCA because it knowingly failed to report adverse events to the Vaccine Adverse Event Reporting System ("VAERS")[1], but nevertheless submitted claims for payment to the United States, through the Centers for Disease Control and Prevention's ("CDC") COVID-19 Vaccination Program. *See* Dkt. 34 ¶ 3.

Relator is a Physician Assistant. *Id.* ¶ 11. She was employed by RRH until she was fired on October 6, 2021. *Id.* ¶¶ 49, 90. During her employment, Relator allegedly observed RRH disregard its reporting obligations. *Id.* ¶ 5. Relator alleges that RRH submitted "thousands" of claims for payment, despite failing to comply with its reporting obligations. *Id.* ¶ 6.

She also alleges that she saw RRH patients suffer serious adverse events following the COVID shot. *Id.* ¶ 53. And she learned that these events must be reported through VAERS. *Id.* ¶ 54. Because Relator had concerns about RRH's reporting efforts, she took the initiative to submit VAERS reports on her own,

---

[1] VAERS is a "national early warning system to detect possible safety problems in vaccines used in the United States." VACCINE ADVERSE EVENT REPORTING SYSTEM, https://vaers.hhs.gov/reportevent.html (last visited June 9, 2025).

sometimes even after her shift ended. *See id.* ¶ 55. She allegedly submitted 160

VAERS reports. *Id.* But she claims the problem "escalated" from May 27, 2021 to

October 6, 2021, when RRH prevented her from submitting 170 serious adverse

events to VAERS. *Id.* ¶ 5.

Noteworthy here, Relator alleges specific examples, including:

- Patient E.F., who presented with sudden shortness of breath and fatigue, one day after receiving the vaccine;

- Patient S.B., who experienced syncope, convulsions, fevers, chills, and myalgias, one day after receiving the vaccine;

- Patient J.F., who presented with arm pain and induration, three days after receiving the vaccine;

- Patient M.D., who was admitted due to hypertensive urgency;

- Patient N.M., who was admitted for bradycardia, AMS, and weakness;

- Patient D.A., who experienced an unknown illness; and

- Patient C.M., who experienced dizziness and unsteady gate.

*Id.* ¶ 91.

RRH had administered COVID shots to Patients M.D., N.M., D.A., and C.M.,

but the provider for the remaining patients in paragraph 91 is "unknown." *Id.*

Relator claims that she tried numerous times to escalade the issue to her

higher leadership, but she was turned away. *See, e.g., id.* ¶¶ 57, 63, 65, 68, 69, 70,

71, 72, 73, 74, 75, 77, 78, 81, 86, 87. She further alleges that RRH knew it needed to

report to VAERS, but failed to provide proper education and training to staff. *See*

3

*id.* ¶¶ 58, 63, 76.  RRH fired Relator after her several attempts to address the issue with RRH.  *See id.* ¶ 90.

Relator alleges that RRH, as a vaccination provider, must report to VAERS under statute and contract.  *Id.* ¶ 44.  She asserts that VAERS reporting is mandatory under statute—specifically, the National Childhood Vaccine Injury Act ("NCVIA") and the emergency use authorization provisions under the Food, Drug and Cosmetic Act, 21 U.S.C. § 360bbb-3 ("EUA").  *See id.* ¶¶ 6, 19–38.  She also alleges that RRH's reporting obligation is an "express material condition" of payment under the Vaccination Program Provider Agreement ("Provider Agreement") that RRH agreed to.  *Id.* ¶¶ 6, 39–48.

The amended complaint contains claims for: (1) presenting and causing false claims, in violation of 31 U.S.C. § 3729(a)(1)(A), *see id.* ¶¶ 123–27; (2) false records, in violation of 31 U.S.C. § 3729(a)(1)(B), *see id.* ¶¶ 128–33; (3) conspiracy, in violation of 31 U.S.C. § 3729(a)(1)(C), *see id.* ¶¶ 134–39; (4) reverse false claims, in violation of 31 U.S.C. § 3729(a)(1)(G), *see id.* ¶¶ 140–48; (5) retaliation, in violation of 31 U.S.C. § 3730(h), *see id.* ¶¶ 149–56; and (6) violation of New York Labor Laws §§ 740 and 741, *see id.* ¶¶ 157–61.

## LEGAL STANDARDS

### I.    Motion to Dismiss

On a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), a "court's task is to assess the legal feasibility of the complaint."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  The court "must take the facts alleged in the

4

complaint as true, drawing all reasonable inferences in [the plaintiff's] favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007).  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal quotation marks and citation omitted).

This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Plausibility depends on many considerations: "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render [the] plaintiff's inferences unreasonable." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (internal quotation marks and citation omitted).

## II.    False Claims Act and Rule 9(b)

The False Claims Act is an anti-fraud statute "enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015)) (internal

quotation marks omitted).  In relevant part, the FCA imposes liability on any

person who "knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval" by the United States Government, 31 U.S.C. §

3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record

or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B), or

"conspires to commit [either] violation," *id.* § 3729(a)(1)(C).  The FCA defines a

"claim" as "'any request or demand . . . for money or property' that is presented,

directly or indirectly, to the United States." *Chorches*, 865 F.3d at 81 (quoting 31

U.S.C. § 3729(b)(2)(A)).

Substantive FCA allegations are subject to the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b).  *Id.* (first citing *United States*

*ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016), and then citing *Gold v.*

*Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995)).  When allegations

involve fraud, Rule 9(b) requires that a party "state with particularity the

circumstances constituting fraud." Fed. R. Civ. P. 9(b).  An FCA complaint alleging

fraud[2] ordinarily must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent." *Chorches*, 865 F.3d at

81 (internal quotation marks and citation omitted).  Courts sometimes characterize

this pleading standard "as the 'who, what, when, where, and how' of the alleged

---

[2] The pleading requirements for FCA retaliation claims are discussed *infra*.

fraud." *United States ex rel. Monda v. Sikorsky Aircraft Corp.*, No. 3:99CV1026 (JBA), 2005 WL 1925903, at *2 (D. Conn. Aug. 11, 2005), *aff'd*, 207 F. App'x 28 (2d Cir. 2006) (citations omitted).

The adequacy of particularized allegations under Rule 9(b) is "case-and context-specific." *Chorches*, 865, F.3d at 81 (internal quotation marks and citation omitted).  Courts have described the "threefold" purpose of Rule 9(b) as "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Ladas*, 824 F.3d at 25 (internal quotation marks and citation omitted).  A court must dismiss a complaint under Rule 9(b) where FCA claims under Sections 3729(a)(1)(A) and (B) rest on "speculation and conclusory allegations." *United States ex rel. Duhaine v. Apple Health Care Inc.*, No. 3:19-CV-00963 (KAD), 2022 WL 3226631, at *5 (D. Conn. Aug. 10, 2022) (quoting *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 249 (2d Cir. 2019)) (internal quotation marks omitted).

Despite Rule 9(b)'s strict pleading requirements, allegations may be based on "information and belief when facts are peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 81–82 (internal quotation marks and citation omitted).  Where pleading is permitted on information and belief, the complaint must "adduce specific facts supporting a strong inference of fraud." *Id.* at 82 (internal quotation marks and citation omitted). [3]

---

[3] *Chorches* will be discussed further below.

7

## DISCUSSION

Relator alleges that each time RRH submitted a claim for payment, it certified compliance with the Vaccine Provider Agreement, the NCVIA, and the EUA. Dkt. 34 ¶ 101. Although *the Provider Agreement* serves as a basis to support potential FCA liability, Plaintiff fails to plead sufficiently any allegations that support a *statutory* violation.

## I.    The Vaccine Provider Agreement may impose liability on the Organization

Relator alleges that, under the Provider Agreement, RRH is responsible for reporting serious adverse events following vaccination. *See id.* ¶ 40. But RRH argues that only its employees "involved in handling [the] COVID-19 Vaccine" may trigger liability under the Provider Agreement. *See* Dkt. 38, at 10.[4]

RRH's interpretation is too narrow. Under the "Organization Identification" section, the Provider Agreement lists the "Organization's legal name," the "Organization telephone number," and the "Organization address." Dkt. 34-24, at 1. RRH is the organization. But the Provider Agreement does not request contact information from the smaller entities, like the vaccination locations that are "affiliated" with the organization.[5] *See id.* Instead, the Provider Agreement only asks for how many vaccination locations the agreement covers. *Id.* This reveals

---

[4] Page numbers referenced refer to the CM/ECF pagination.

[5] The Provider Agreement states that Section B "must be completed for each vaccination [l]ocation," but that section must be filled out for "each vaccination [l]ocation covered *under the Organization* listed in Section A." *Id.* (emphasis added). Section A only requests contact information from the organization. *Id.*

that the parent company or, here, RRH, is ultimately responsible under this contract. In fact, the Provider Agreement states that "this is an agreement between [the] [o]rganization and CDC." *Id.* at 2.

Additionally, the organization's "chief medical officer (or equivalent) and chief executive officer (or chief fiduciary) . . . must complete and sign the [Provider Agreement]." *Id.* at 1. And they are required to provide their contact information; there is a section on the form specifically for "Responsible Officers," particularly, the Chief Medical Officer (or equivalent) and the Chief Executive Officer (or Chief Fiduciary). *Id.* Responsible officers—as well as "the Organization"—are "accountable for compliance." *Id.* Thus, the Provider Agreement imposes obligations and potential liability on RRH, not the individual vaccination locations or the handlers at those locations. RRH bears "organizational responsibility" as a vaccine provider under this contract. *See* Dkt. 34 ¶ 44. Under the Provider Agreement, RRH, and its employees, must adhere to the requirements set forth therein.

Because RRH is liable under this agreement, it must report adverse events for patients who were vaccinated at RRH. Here, Relator alleges four patients who experienced adverse events after receiving the COVID vaccine at RRH. *See id.* ¶ 91. Thus, under the Provider Agreement, RRH was responsible for reporting any adverse events that these patients experienced. And this theory is valid under the FCA.

9

But the agreement has its limitations.  The Provider Agreement, for example, does not require RRH to report adverse reactions regardless of where the patient was vaccinated.  Indeed, the Agreement's reporting obligations are dose specific (Dkt. 34-24, at 3) and apply to the shots administered by RRH—not by anyone outside of RRH.

Relator alleges that the NCVIA and the EUA also impose reporting obligations on Defendants and that, because Defendants failed to report adverse events to VAERS, they violated the FCA.  *See* Dkt. 34 ¶¶ 19–38.  The Court disagrees.

Under the NCVIA, "[e]ach health care provider and vaccine manufacturer shall report . . . the occurrence of any event *set forth in the Vaccine Injury Table* . . . ."  42 U.S.C. § 300aa-25(b)(1)(A) (emphasis added).  The COVID shot, however, is not listed on this table.  *See* Dkt. 38, at 14–15; *see also* Dkt. 34-23.  And the Provider Agreement does not reference the table either.  *See* Dkt. 34-24.  Thus, the NCVIA is not a basis for liability here.

Moreover, under the EUA, the Secretary of Health and Human Services ("HHS") is authorized to introduce a "drug, device, or biological product intended for use in an actual or potential emergency . . . ."  21 U.S.C. §§ 321(d), 360bbb-3(a)(1).  Plaintiff, however, fails to link a violation under this statute to an FCA claim.[6]

---

[6] And even if the EUA does create a basis for liability, it does not expand the obligations imposed under the Provider Agreement.  *See* Dkt. 38, at 16.

10

In sum, there is no statutory basis under the NCVIA or EUA for RRH to be liable under the FCA. This leaves the allegations raised under paragraph 91 as the only possible FCA claim—based on the Provider Agreement—if Relator alleged them with sufficient particularity under Rule 9. This is analyzed below.

## II.    The Amended Complaint alleges fraud with sufficient particularity as to paragraph 91

### A. Falsity/Misrepresentation (Implied Certification Theory)

Under the FCA, a plaintiff must allege a "false or fraudulent claim for payment or approval" or "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B); *see also Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*, No. 23-209-cv, 2023 WL 7130553, at *2 (2d Cir. Oct. 30, 2023). Plaintiff asserts claims for both. Dkt. 34 ¶¶ 123–133. A "claim" includes "direct requests to the [g]overnment for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *United States ex rel. Gelbman v. City of New York*, No. 14-CV-771 (VSB), 2018 WL 4761575, at *5 (S.D.N.Y. Sept. 30, 2018), *aff'd*, 790 F. App'x 244 (2d Cir. 2019) (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016)). FCA claims are either factually false or legally false. *Gelbman*, 2018 WL 4761575, at *5; *see also United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 104 (2d Cir. 2021). A "factually false claim" is one that is "untrue on its face," such as "a claim that 'include[s] an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Foreman*, 19 F.4th at 104 n.7

11

(quoting *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011)).

Here, Relator first alleges that RRH submitted factually false claims because it "misrepresented the nature of services provided when seeking payment." Dkt. 34 ¶ 103. Particularly, Relator claims that RRH failed to report a patient that died after a vaccination and altered that patient's medical records to "conceal" the patient's recent vaccine. *Id.* ¶ 104. But this is not sufficient. Relator fails to connect this example to a claim RRH submitted that is "untrue on its face," like providing an incorrect description or failing to provide certain goods or services. In other words, Relator does not allege that RRH submitted a claim where it represented that this patient received a COVID vaccine, but changed the medical records to indicate otherwise, or that RRH submitted a VAERS report for that patient, when it really did not. Thus, Relator does not adequately plead that RRH submitted factually false claims.[7]

_____

[7] Additionally, Relator alleges that "RRH fraudulently induced its participation in the vaccination program by initially certifying it would comply with all safety monitoring requirements while never intending to implement comprehensive adverse event reporting." *Id.* ¶ 107. Defendants argue that this is "wholly conclusory" and "should not be assumed true" because "Relator has not plausibly alleged any facts describing representations that RRH made to the CDC to induce its entrance into the Vaccination Provider Agreement." Dkt. 38, at 24. This Court agrees. *See United States v. Strock*, 982 F.3d 51, 60 (2d Cir. 2020) ("Under this fraudulent inducement theory, FCA liability attaches not because a defendant has submitted any claim for payment that is literally false, but instead because the contract under which payment [is] made is procured by fraud.") (internal quotation marks and citations omitted).

But Relator also alleges that RRH submitted legally false claims. A legally false claim rests on "a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *United States ex rel. Askari v. PharMerica Corp.*, No. 23-909-CV, 2024 WL 1132191, at *2 (2d Cir. Mar. 15, 2024) (internal quotation marks and citation omitted). There are two types of legally false claims that a relator can rely on to support an FCA claim. *Id.* The first is an express false certification claim. In addition, in some circumstances, "implied false certification" can amount to a false or fraudulent claim. *United States ex rel. Yu v. Grifols USA, LLC*, No. 22-107, 2022 WL 7785044, at *2 (2d Cir. Oct. 14, 2022) (citing *Escobar*, 579 U.S. at 186).

Relator alleges both—specifically, that RRH expressly and implicitly certified compliance with the COVID-19 Vaccination Program when it submitted claims for payment. *See* Dkt. 34 ¶ 101. Defendants argue that Relator does not sufficiently plead any particularized allegations that support an express false certification theory. Dkt. 38, at 21–22. The Court agrees. Thus, this case concerns only the implied false certification theory.

Under the implied false certification theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment." *Escobar*, 579 U.S. at 180. But "if that claim fails to disclose the defendant's violation of a material, statutory, regulatory, or contractual requirement . . . , the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under [section] 3729(a)(1)(A)." *Id.*

13

In some instances, the implied false certification theory can be a basis for liability "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.* at 181. In these circumstances, "liability may attach if the omission renders those representations misleading." *Id.* But not all misrepresentations are actionable; the challenged claim must omit "critical qualifying information." *Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *2 (citing *Escobar*, 579 U.S. at 188–89).

Liability for failing to disclose violations of legal requirements "does not turn upon whether those requirements were expressly designated as conditions of payment." *Escobar*, 579 U.S. at 181. While that is relevant, it is not dispositive. *Id.* at 190. And even if a requirement is expressly designated as a condition of payment, "not every violation of such requirement gives rise to liability." *Id.* at 181. What matters is "whether the defendant *knowingly* violated a requirement that the defendant knows is *material* to the [g]overnment's payment decision." *Id.* (emphasis added). Materiality and knowledge (or scienter) are "rigorous" pleading requirements that are "strictly enforced." *Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *2 (citing *Escobar*, 579 U.S. at 192). A failure to plead either is fatal. *Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *2.

In sum, the implied certification theory can be a basis for liability when at least two conditions are met. First, "the claim does not merely request payment,

but also makes specific representations about the goods or services provided . . . ."
*Escobar*, 579 U.S. at 190; *see also Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *2.
And second, "the defendant's failure to disclose noncompliance with material
statutory, regulatory or contractual requirements make those representations
misleading half-truths." *Escobar*, 579 U.S. at 190.

As relevant here, there is a contractual basis of potential liability—
specifically as to the allegations raised in paragraph 91. The issue, then, is whether
those allegations satisfy Rule 9.

The Provider Agreement lists "Agreement Requirements" that "are *material
conditions of payment* for COVID-19 Vaccine-administration claims submitted by
[the] [o]rganization to any federal healthcare benefit program . . . ." Dkt. 34-24, at
2–3 (emphasis added). And "[t]o receive one or more of the publicly funded COVID-
19 vaccines (COVID-19 Vaccine), constituent products, and ancillary supplies at no
cost, [the] [o]rganization agrees that it will adhere to . . . [these] requirements[.]"
*Id.* at 2.

At issue is the requirement that an organization "must report moderate and
severe adverse events following vaccination to [VAERS]." *Id.* at 3. Further, under
this contract, reimbursement for administering the vaccine "is not available under
any federal healthcare program if [the] [o]rganization fails to comply with these
requirements with respect to the administered COVID-19 Vaccine dose." *Id.* When
the organization submits a reimbursement claim for COVID-19 Vaccine

administration, that organization "expressly certifies that it has complied with these requirements with respect to that administered dose." *Id.*

Accordingly, each time RRH submits a claim for payment, under this Provider Agreement, it is not merely requesting payment, but instead making specific representations that it has complied with the requirements set forth therein. *Escobar*, 579 U.S. at 190; *see also Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *2.

On this record, particularity is alleged.

## B. Materiality

A misrepresentation about compliance with a statutory, regulatory, or contractual requirement "must be material to the [g]overnment's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. A relator, therefore, must plead materiality "with particularity under Rule 9(b)." *Fed. Deposit Ins. Corp.*, 2023 WL 7130553, at *3 (citation omitted).

"Material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). To assess materiality, the court must look to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation . . . rather than superficial designations." *Yu*, 2022 WL 7785044, at *2 (quoting *Foreman*, 19 F.4th at 109).

The Supreme Court identified three factors in assessing materiality: "(1) whether the government expressly designates compliance with a particular

16

statutory, regulatory, or contractual requirement as a condition of payment; (2) the

government's response to noncompliance with the relevant contractual, statutory, or

regulatory provision; and (3) whether the defendants' alleged noncompliance was

minor or insubstantial." *Yu*, 2022 WL 7785044, at *2 (quoting *Foreman*, 19 F.4th at

110) (internal quotation marks omitted); *see also Escobar*, 579 U.S. at 194–96. This

inquiry is "holistic," meaning a court should weigh these factors. *See Foreman*, 19

F.4th at 110, 117.

   1. Express Condition of Payment

   Relator alleges that reporting to VAERS is material to the Government's

payment decision because it is required by the Provider Agreement. *See* Dkt. 34 ¶¶

40, 41, 119. Moreover, the Provider Agreement expressly states that each

requirement is a "condition of payment," and that the Government will not

reimburse RRH if it fails to comply. *See* Dkt. 34-24, at 3. Thus, although not

determinative, it is relevant that the Provider Agreement specifies that the

requirements are "conditions of payment." This factor weighs in Relator's favor.

*Escobar*, 579 U.S. at 190 ("Whether a provision is labeled a condition of payment is

relevant to but not dispositive of the materiality inquiry").

   2. Government's Response to Noncompliance

   As to the second factor, evidence that the Government "consistently refuses to

pay claims in the mine run of cases based on noncompliance with the particular

statutory, regulatory, or contractual requirement at issue can prove materiality."

*Yu*, 2022 WL 7785044, at *3 (quoting *Escobar*, 579 U.S. at 195) (internal quotation

marks omitted).  But "if the [g]overnment pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.*  Thus, this factor requires examining the Government's reaction to noncompliance in other similar cases[8] and in the case at issue.  *See Foreman*, 19 F.4th at 111–12 (citing *Escobar*, 579 U.S. at 194–95).

Here, RRH argues that Relator reached out to the FDA, CDC, and New York State Department of Health about the reporting obligations to VAERS, and she retained a law firm to mail letters to the HHS and CDC, but these agencies did "nothing" in response.  Dkt. 38, at 25.  Defendants contend that this is "highly probative that the alleged fraud is immaterial." *Id.*

Although these agencies did not respond or take any action, it is unclear whether the CDC had "actual knowledge."  There is no indication that the CDC investigated or audited RRH and continued to pay, despite any wrongdoing.  *See Foreman*, 19 F.4th at 115, 117–18; *see United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (concluding that the government's response showed strong evidence that the requirements at issue were not material, where it investigated the allegations and did not disallow any charged costs).  And even if the Government had actual knowledge, the Government may choose to continue funding this type of contract given its extensive approach to COVID-19—making the issue not particularly probative here.  *See Foreman*, 19 F.4th at 115

---

[8] Here, neither side references any similar cases.

("There may be circumstances where the government's payment of a claim or failure to terminate a contract despite knowledge of certain alleged contractual violations will not be particularly probative of lack of materiality."); *see also United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003). Thus, at best, this factor is neutral.

   3. <u>Substantiality</u>

The last factor is whether RRH's noncompliance was substantial. Materiality "cannot be found where noncompliance is minor or insubstantial . . . because material falsehoods are those that go to the very essence of the bargain." *Foreman*, 19 F.4th at 116 (internal quotation marks and citation omitted). Relator must demonstrate more than a "superficial designation," but instead show "sufficiently widespread deficiencies in the contractor's performance or identified misrepresentations that go to the heart of the bargain, such that any regulatory, statutory, or contractual violations would likely affect the Government's payment decision." *Id.* (internal quotation marks and citation omitted).

Defendants argue that the alleged noncompliance is not substantial because Relator only identified four to five patients RRH vaccinated and later admitted. Dkt. 38, at 26. Additionally, Defendants argue that "Relator has not plausibly linked up VAERS reporting failures occurring at the hospital with violations of either contractual or statutory duties, which, to the extent they apply, only impose obligations in geographical and temporal proximity to the vaccine clinic and those who handle vaccines." *Id.*

But the Provider Agreement applies here. And this obligation is not limited to the vaccine clinic or handlers—it extends to any patient RRH vaccinates and later admits for an adverse reaction. Additionally, although Relator only alleges four patients that RRH vaccinated, admitted, and did not report to VAERS (Dkt. 34 ¶ 91), in accordance with the Provider Agreement, discovery has not occurred.[9] In other words, the key at this stage is whether these "identified misrepresentations . . . go to the heart of the bargain." *Foreman*, 19 F.4th at 116 (internal quotation marks and citation omitted). Here, they do. The Agreement specifically addresses this issue and linked it to payment.

Relator alleges that the FDA and CDC maintain that VAERS reporting is a material condition and that the Provider Agreement demonstrates this. *See* Dkt. 34 ¶ 118. The Provider Agreement, which is incorporated by reference to the amended complaint, is persuasive here. The contract does not just state that the requirements listed are "conditions of payment;" it goes one step further in stating that the conditions are "material" to the Government's payment decision. Dkt. 34-24, at 3. And it claims that if the organization does not comply with the terms, that organization may be liable under federal law, including, *inter alia*, the FCA. *Id.*

The intention is clear here—these twelve conditions, including reporting to VAERS, are essential to this contract. They go to the "heart of the bargain" and are necessary to carry out the COVID Vaccination Program. This intention also aligns

---

[9] She also alleges that RRH failed to report an additional 170 patients, but their vaccination locations are "unknown" at this time. *Id.* ¶¶ 92–93.

with Relator's allegations regarding the purpose behind VAERS—specifically, that VAERS gives the "CDC and FDA vital information to help quickly identify potential health concerns and ensure vaccines are safe." Dkt. 34 ¶ 23. Thus, this factor weighs in Relator's favor.

Therefore, weighing all factors, Relator has plausibly alleged with particularity that the condition at issue here—reporting adverse events to VAERS—is material to the Government's payment decision. *Foreman*, 19 F.4th at 118 ("Taken together with the substantiality factor, which also weighs in favor of materiality as to the . . . allegations, [the relator] has sufficiently pled materiality with respect to his claims . . . ."); *see also Strock*, 982 F.3d at 65.

## C. Scienter

Under the implied certification theory, a defendant must have "knowingly violated a requirement that the defendant knows is material to the [g]overnment's payment decision." *Escobar*, 579 U.S. at 181. The terms "knowing" and "knowingly" mean that a person, with respect to information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Additionally, "knowledge" does not require "proof of specific intent to defraud." *Id.* § 3729(b)(1)(B).

To comply with Rule 9(b), a relator may assert knowledge "generally," but must still "plead the factual basis which gives rise to a strong inference of fraudulent intent." *Strock*, 982 F.3d at 66 (internal quotation marks and citation

omitted).  To show a "strong inference of fraud," relator may either: (1) allege facts showing that the defendants had "both motive and opportunity to commit fraud," or (2) allege facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* (internal quotation marks and citation omitted).

Defendants argue that Relator fails to allege any facts "bearing on RRH's knowledge that could support a strong inference of fraudulent intent," and her allegations instead involve differences in medical opinions and in interpreting the reporting obligations.  Dkt. 38, at 30, 32.  The Court disagrees.

Relator adequately alleges that Defendants had actual knowledge that reporting to VAERS was material to the Government's payment decision.  *See* Dkt. 34 ¶¶ 110–11.  To participate in the COVID Vaccination Program, the Provider Agreement requires an organization to certify that "all relevant officers, directors, employees, and agents of [the] [o]rganization involved in handling COVID-19 Vaccine understand and will comply with the agreement requirements listed . . . ."  Dkt. 34-24, at 3; Dkt. 34 ¶ 111.  It also expressly states that reporting to VAERS is a "*material* condition of payment."  Dkt. 34-24, at 3.  Additionally, Dr. Gellasch agreed with Relator that "we must report to VAERS per guidance."  Dkt. 34 ¶¶ 65, 110.  And RRH acknowledged that it needed to help healthcare providers comply with their responsibility to report adverse events.  *Id.* ¶¶ 80, 110.

Relator also asserts "strong circumstantial evidence of . . . recklessness" as to materiality—particularly in the instances where Relator is dealing with RRH.  *See Strock*, 982 F.3d at 66.  For example, RRH allegedly ordered Relator to "dial . . .

22

back" her reporting efforts. Dkt. 34 ¶ 112. And despite RRH certifying that its "officers, directors, employees, and agents . . . understand and [will] comply with the agreement requirements," its President told Relator that "it is not the organization[']s duty to educate providers." *Id.* ¶ 114; Dkt. 34-24, at 3. Thus, Relator's allegations about her interactions with RRH are sufficient to allege scienter.

Moreover, Relator asserts that RRH "remov[ed] vaccine information from [a patient's] death certificate and discharge summary" to conceal reportable events. Dkt. 34 ¶ 116. Not only does this further support that RRH acted recklessly in carrying out its reporting obligations, but, when paired with Relator's allegation that RRH wanted to prioritize high vaccination numbers over mandatory safety monitoring, it suggests a motive to commit fraud. *Id.*

Therefore, accepting these allegations as true, Relator has plausibly alleged scienter with particularity to support a claim under the FCA.

## D. *Chorches*

A relator must also sufficiently allege that the defendant submitted false claims for payment. Here, Relator satisfies this requirement.

FCA claims are subject to Rule 9(b). *Chorches*, 865 F.3d at 81. Rule 9(b) is generally a rigid requirement; however, "allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Id.* at 81–82. Pleading on information and belief is a "desirable and essential expedient when matters that are necessary to complete the statement of a claim are not

within the knowledge of the plaintiff but he [or she] has sufficient data to justify interposing an allegation on the subject." *Id.* at 82 (internal quotation marks and citation omitted). In other words, Rule 9(b) does not require that "every *qui tam* complaint provide details of actual bills or invoices submitted to the government," if the relator "makes plausible allegations . . . that lead to a strong inference that specific claims were indeed submitted and that information about the details of the claims submitted are peculiarly within the opposing party's knowledge." *Id.* at 93.

Here, Relator alleges that RRH submitted reimbursement claims for "thousands" of COVID vaccinations, certifying that it reported adverse events to VAERS. *See* Dkt. 34 ¶ 95. And she alleges that she learned about these claims from other employees and publicly available information. *Id.* Defendants argue that Relator fails to satisfy Rule 9(b) because she does not allege anything about events taking place at the vaccine clinic or the personnel involved in handling COVID vaccines. Dkt. 38, at 27. But as stated previously, this interpretation is too narrow. The Provider Agreement imposes an obligation on RRH, not the individual vaccination locations and handlers, to comply with VAERS reporting. And because Relator worked at RRH from 2007 to 2021, when the alleged "scheme" occurred, she directly observed patients experiencing adverse events and how RRH handled its reporting efforts. *See* Dkt. 34 ¶¶ 49–94.

Relator did not work in billing, and does not attach actual bills or invoices to her amended complaint, but her allegations are plausible and "lead to a strong inference that specific claims were indeed submitted . . . ." *Chorches*, 865 F.3d at

24

93. She asserts that "RRH, like all healthcare organizations, uses sophisticated accounting and billing systems to track services and ensure payment." Dkt. 34 ¶ 97. Particularly, for each COVID vaccine dose administered, RRH records the service in the patient's medical record, documents it in the NYSIIS system, and then generates a claim for payment. *Id.* Namely, RRH tracks each vaccine dose, through the payment process.

Defendants argue that Relator fails to allege facts showing a strong inference that RRH submitted specific claims because the patients that Relator provides as examples did not all receive their vaccines at the RRH clinic. Dkt. 38, at 27. Although Relator does not list a vaccination location for every patient, she does allege (in paragraph 91) four patients, who received a vaccine *at RRH*, experienced an adverse event, went back to RRH, and as to whom RRH did not submit VAERS reports. Dkt. 34 ¶ 91. Accepting these allegations as true, RRH failed to adhere to the Provider Agreement. RRH was presumably paid for all shots given. Thus, Relator alleges specific and plausible facts from which this Court may infer that Defendants submitted false claims. *See Chorches*, 865 F.3d at 84.

Relator also plausibly alleges that the "claims submitted are peculiarly within the opposing party's knowledge." *Id.* at 93. Defendants contest this, claiming that Relator accessed RRH's systems to learn about her patients' vaccination statuses. Dkt. 38, at 28–29. While she could look up whether a patient received a vaccine, nowhere does Relator allege that she had access to RRH's billing records. To the contrary, she asserts that RRH controls its billing system

exclusively, and the billing records are in RRH's possession. Dkt. 34 ¶¶ 97, 108. And she alleges "sufficient data to justify interposing an allegation on the subject," despite not having access to the billing system. *Chorches*, 865 F.3d at 82 (internal quotation marks and citation omitted). For instance, she asserts that she "knows RRH's billing department processes vaccine administrative records into claims seeking the standard $40 payment per dose through established federal health program billing procedures, including Medicare, Medicaid and HRSA Covid-19 Uninsured Program." Dkt. 34 ¶ 97. She also states that the billing records, documenting the false claims, include: (1) claim submission dates; (2) certification language; and (3) administration details demonstrating systematic false claims. *Id.* ¶ 108.

In sum, Defendants' motion to dismiss is denied as to Relator's FCA claim (Count 1) to the extent based on the implied false certification theory, as it relates to the Provider Agreement, and involving patients who received a COVID shot at RRH. The motion to dismiss is also denied as to Relator's section 3729(a)(1)(B) claim (Count 2) for the same reasons set forth in connection with her section 3729(a)(1)(A) claim. RRH knew reporting to VAERS was a material condition of payment, under the Provider Agreement, but allegedly falsified records to conceal reportable events in connection with the false claim. *See, e.g., id.* ¶¶ 104, 116.

## III.    **Relator's reverse false claims count is dismissed**

Relator alleges liability for reverse false claims pursuant to section 3729(a)(1)(G). That section states that any person who "knowingly makes, uses, or

causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(G). Reverse false claims counts are also subject to Rule 9(b)'s heighted pleading standard. *Foreman*, 19 F.4th at 119.

A court should dismiss such a count if the complaint "makes no mention of any financial obligation that the [defendants] owed to the government," and "does not specifically reference any false records or statements used to decrease such an obligation . . . ." *Id.* (internal quotation marks and citation omitted). Additionally, the Second Circuit recognized that "several district courts, some of them within this Circuit, have concluded that a reverse false claim cannot turn on the same conduct underlying a traditional false claim." *Id.* at 119. And to conclude otherwise would mean that "any time a defendant violated sub-sections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay the Government the fraudulently-obtained payments." *Id.* at 120 (internal quotation marks and citation omitted). Thus, this "[t]ype of redundant false claim is not actionable under subsection (a)(1)(G)." *Id.* (internal quotation marks and citation omitted).

Here, other than the conduct underlying Relator's false claims under sections 3729(a)(1)(A) and (B), Relator does not adequately allege any independent facts that

support her reverse false claims count, and, as such, it is dismissed. *See* Dkt. 38, at 32–33.

## IV.    Relator's FCA conspiracy claim is dismissed

Relator also fails to allege a conspiracy claim pursuant to section 3729(a)(1)(C), which states that "any person who . . . conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . is liable to the United States Government . . . ." 31 U.S.C. § 3729(a)(1)(C).

Defendants argue that the Court should dismiss this claim in accordance with the intra-corporate conspiracy doctrine. Dkt. 38, at 33–34. The Court agrees.

Under the intra-corporate conspiracy doctrine, "one entity cannot conspire with its employees" and "it is well established that one corporation and wholly-owned subsidiary cannot conspire with each other." *United States ex rel. Ross v. Indep. Health Corp.*, No. 12-CV-299S, 2023 WL 24055, at *12 (W.D.N.Y. Jan 3, 2023) (quoting *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 98 (D.D.C. 2014)); *see also United States ex rel. Schwartz v. Document Reprocessors of N.Y., Inc.*, 692 F. Supp. 3d 71, 81 n.3 (W.D.N.Y. 2023) ("Relator's cursory attempt to assert a conspiracy between a corporation and its owner/corporate officers runs afoul of the intra-corporate conspiracy doctrine.").

Here, Relator alleges that "RRH and its administrators entered into agreements with each other to violate the False Claims Act . . . ." Dkt. 34 ¶ 120. Relator is, thus, attempting to plead a conspiracy claim in violation of the intra-

corporate conspiracy doctrine.  A corporation and its employees (including its

owners and officers) generally cannot conspire among each other.

Courts in this Circuit recognize an exception to this doctrine "when a party

acts pursuant to personal interests 'separate and apart from the entity.'"  *Ross*,

2023 WL 24055, at *12 (quoting *Vegas v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y.

2009)).  But the amended complaint does not contain any such allegations.

Therefore, the Court grants Defendants' motion to dismiss the conspiracy claim.

**V.    The Amended Complaint alleges a plausible retaliation claim**

The FCA's anti-retaliation provision states:

> Any employee, contractor, or agent shall be entitled to all relief
> necessary to make that employee, contractor, or agent whole, if that
> employee, contractor, or agent is discharged, demoted, suspended,
> threatened, harassed, or in any other manner discriminated against in
> the terms and conditions of employment because of lawful acts done by
> the employee, contractor, agent or associated others in furtherance of an
> action under this section or other efforts to stop 1 or more violations of
> this subchapter.

31 U.S.C. § 3730(h)(1).

To state a retaliation claim under the FCA, courts "generally require[ ] a

plaintiff to show that (1) he [or she] engaged in activity protected under the statute,

(2) the employer was aware of such activity, and (3) the employer took adverse

action against him [or her] because he [or she] engaged in the protected activity."

*Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (quoting

*Chorches*, 865 F.3d at 95) (internal quotation marks omitted).  If an employee's

alleged actions "are sufficient to support a reasonable conclusion that the employer

could have feared being reported to the government for fraud or sued in a *qui tam*

action by the employee," then the employee has stated a retaliation claim under section 3730(h). *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

FCA-based retaliation claims are not subject to the more stringent pleading requirements of Rule 9(b). *See Chorches*, 865 F.3d at 95 ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA."). Rather, a plaintiff must "show a good faith basis, or objectively reasonable basis, for believing that he or she was investigating matters in support of a viable FCA case." *Swanson v. Battery Park City Auth.*, No. 15-CV-6938 (JPO), 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) (internal quotation marks and citation omitted). Ultimately, the conduct must be "directed at exposing a fraud upon the government." *Mirza v. Garnet Health*, No. 20-CV-556 (PMH), 2022 WL 826410, at *9 (S.D.N.Y. Mar. 17, 2022), *aff'd sub nom. Mirza v. Orange Reg'l Med. Ctr.*, No. 22-815-CV, 2024 WL 3042239 (2d Cir. June 18, 2024) (internal quotation marks and citations omitted).

Here, Relator plausibly alleges that RRH retaliated against her when it fired her.

### A. Protected Activity

A relator engages in protected activity if he or she tries to stop one or more FCA violations. *See* 31 U.S.C. § 3730(h)(1); *see also Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *2 (2d Cir. Jan. 17, 2024). Such efforts "can include both complaining internally to supervisors about suspected fraudulent practices and

30

refusing to engage in such practices." *Pilat*, 2024 WL 177990, at *2. A party,
however, "need not succeed on the underlying FCA claim to successfully show
retaliation, but 'he [or she] must demonstrate that he [or she] had been
investigating matters that were calculated, or reasonably could have led, to a viable
FCA action." *Schwartz*, 692 F. Supp. 3d at 81 (quoting *United States v. N. Adult
Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 298 (E.D.N.Y. 2016)).

      Here, Defendants assert that Relator did not engage in protected activity
because she fails to allege that she suspected fraud; she only had concerns about
RRH's reporting obligations to VAERS. *See* Dkt. 38, at 35–36. But, in *Pilat*, the
Second Circuit disagreed with dismissing a retaliation claim on that basis. *See
Pilat*, 2024 WL 177990, at *1–2 ("The district court determined that [the] [r]elators
did not allege that they engaged in protected activity because the complaints to
supervisors they rely on to support their retaliation claims did not have anything to
do with potential false claims and were more appropriately characterized as
concerns about patient care . . . We disagree . . . .") (internal quotation marks and
citation omitted). Thus, because Defendants make a similar argument here, it is
not sufficient.

      Relator alleges that she refused to participate in the alleged wrongdoing. She
asserts that she "undertook specific actions to stop [D]efendants' False Claims Act
violations," when she "identified and reported over 160 adverse events to VAERS,
documented additional unreported cases, alerted management to their reporting
obligations, and maintained records of systematic non-compliance." Dkt. 34 ¶ 151.

Furthermore, she alleges four examples where RRH vaccinated a patient—who experienced an adverse event—and subsequently did not report the adverse event to VAERS, in accordance with the Provider Agreement. *Id.* ¶ 91.  In drawing all reasonable inferences in Relator's favor, her acts were an "effort[ ] to stop 1 or more violations" of the FCA. *See Pilat*, 2024 WL 177990, at *2 (internal quotation marks and citation omitted).

Relator also alleges numerous examples where she complained internally to supervisors about the suspected fraudulent practices. *See, e.g.*, Dkt. 34 ¶¶ 57, 63, 65, 68, 69, 70, 71, 72, 73, 74, 75, 77, 78, 81, 86, 87.  For instance, on one occasion, Relator emailed Dr. Tara Gellasch, UMMC's Chief Medical Officer, about an unreported adverse event, stating: "I want this case reported and I want their VAERS case number for my records because now having knowledge of this case and not reporting it myself as I have been instructed to do by the system, puts me in a position to knowingly violate the law." Dkt. 34-16; *see also* Dkt. 34 ¶ 75.  Not only does this example support that Relator notified her leadership about the issue, but also that she refused to engage in, and tried to stop, the suspected fraudulent activity.

Thus, the amended complaint plausibly alleges that Relator engaged in protected activity.

## B. Awareness of that Activity

As noted, to satisfy the second element, Relator must sufficiently plead that Defendants knew she was engaging in protected activity. *Chorches*, 865 F.3d at 95.

32

Relator alleges that "[m]anagement specifically acknowledged her VAERS reporting efforts, audited her submissions,[10] and received multiple communications from her regarding their legal obligations to report." Dkt. 34 ¶ 153. These allegations are plausible because Relator also provides examples to support these assertions. For instance, she alleges, *inter alia*, that she emailed UMMC's Chief Medical Officer and President about reporting to VAERS, and she volunteered to report on her colleagues' behalf until RRH educated or trained its employees and developed a better system for reporting. *Id.* ¶ 57.

Defendants also do not appear to contest this element. *See* Dkt. 38, at 34–38; *see also* Dkt. 45, at 41. Thus, in accepting these allegations as true, the second element is satisfied.

## C. Adverse Action

Lastly, Relator must show that Defendants took "adverse action" against her for engaging in protected activity. *See N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 299 ("The retaliatory discharge must occur *because* of the protected conduct.") (citations omitted). At the motion to dismiss stage, temporal proximity between the protected conduct and adverse action is a sufficient basis for a claim to go forward. *See Garcia v. Aspira of N.Y., Inc.*, No. 07 CIV. 5600 (PKC), 2011 WL 1458155, at *5 (S.D.N.Y. Apr. 13, 2011).

---

[10] The Hospital's Chief Quality Officer allegedly audited her and concluded she overreported to VAERS. *See* Dkt. 34 ¶ 74.

33

Here, RRH terminated Relator on October 6, 2021, after she engaged in the
protected activity described above. Dkt. 34 ¶ 90.   Most notably, RRH fired Relator
shortly after Relator retained a law firm (Siri & Glimstad LLP) to send a letter to
RRH about its underreporting.[11]  *Id.* ¶¶ 79, 83.  This alleged temporal proximity,
combined with the allegations about her protected conduct, satisfies the causation
prong at this early 12(b)(6) stage.  *Beckles-Canton v. Lutheran Soc. Sers. of N.Y.,*
*Inc.*, No. 20 CIV. 4379 (KPF), 2021 WL 3077460, *9–10 (S.D.N.Y. July 20, 2021).
Thus, the amended complaint plausibly alleges that RRH took adverse action
against Relator for engaging in protected conduct.

Defendants' argue that RRH terminated Relator because she refused to get a
COVID vaccine, but this is insufficient to dismiss the retaliation claim at this stage
because temporal proximity is plausibly alleged here.  Dkt. 38, at 37.[12]  Thus,
Defendants' motion to dismiss is denied as to Relator's FCA-based retaliation claim.

---

[11] The amended complaint alleges that Siri & Glimstad LLP sent RRH letters on
June 28, 2021 and July 21, 2021 regarding its reporting obligations.  *Id.* ¶¶ 79, 83.
RRH fired Relator on October 6, 2021—less than three months after the last letter
sent.  *Id.* ¶ 90.

[12] In light of this, the Court denies Defendants' request for this Court to take
judicial notice of a declaration submitted in connection with a state court case, as
well as the docket associated with that action.  *See id.* at 37 n.8.  Relator's request
to strike Exhibit D to the Declaration of James E. Peacock, Esq. (Dkt. 38-1) is also
denied as moot.  *See* Dkt. 45, at 44.

## VI.    Relator's state law claim survives

The amended complaint also asserts a retaliation claim under state law—specifically N.Y. Labor Law §§ 740–41. *See* Dkt. 34 ¶¶ 157–61. Defendants fail to set forth any substantive argument as to whether this Court should exercise supplemental jurisdiction if Relator's federal claims survive, as some do here. *See* Dkt. 38, at 38; *see also* Dkt. 45, at 44. Because this issue is not contested, and for the below reasons, the motion to dismiss is denied as to the state law claim.

Under section 1367(a), a federal court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Claims "form part of the same case or controversy" if they "derive from a common nucleus of operative fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (internal quotation marks and citation omitted). Here, the state and federal actions arise from the same set of facts—particularly, that RRH retaliated against Relator because she tried to stop RRH from committing False Claims Act violations. *See* Dkt. 34 ¶ 158. Thus, section 1367(a) is satisfied.

When section 1367(a) applies, "the discretion to decline supplemental jurisdiction is available *only if* founded upon an enumerated category of subsection 1367(c)." *Shahriar*, 659 F.3d at 245 (internal quotation marks and citation omitted). Under section 1367(c), a court may decline to exercise supplemental jurisdiction over a claim if:

(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

But these do not appear to apply. Here, there are remaining claims the Court has original jurisdiction over, so that category does not apply. Nor does the state law claim appear to raise a "novel or complex issue of State law." The state law claim also does not predominate here—this is primarily a FCA case, which the Court has original jurisdiction over. Lastly, the Court does not foresee any other compelling reasons as to why it should decline jurisdiction.

Therefore, the Court will exercise supplemental jurisdiction over the state law claim.

## CONCLUSION

For the reasons discussed above, the Court DENIES Defendants' motion as to Relator's false claims counts, solely as to the allegations raised in paragraph 91 (and any alike) involving patients who received COVID vaccines from RRH as set forth above (Counts 1 and 2); FCA retaliation claim (Count 5); and state law retaliation claim (Count 6). The Court GRANTS the remainder of Defendants' motion to dismiss the amended complaint.

SO ORDERED.

Dated:       June 11, 2025
             Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE